OPINION
ROTH, Circuit Judge:
Benjamin Franklin opined that “in this world nothing can be said to be certain, *668 except death and taxes.”[1] But the advent of the “all events” test renders Franklin’s pronouncement at best partially correct.
The Tax Code does not limit the availability of deductions to expenses for which payment is certain. Rather, accrual method taxpayers are expressly permitted to deduct expenses before they are paid, so long as “all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy.”[2] A codified legal fiction affords taxpayers even greater flexibility in the realm of recurring expenses, for which an anticipated liability may be deemed “incurred” even if the predicate costs are not themselves incurred during the year a deduction is claimed.[3]
Here, by disallowing deductions claimed by a supermarket chain based on rewards shoppers had earned but not yet redeemed, the Tax Court misapplied the “all events” test as it applies to recurring expenses. For that reason, we will reverse and remand this case to the Tax Court with instructions to grant judgment in favor of Giant Eagle, Inc., and its subsidiaries (collectively, Giant Eagle) on the basis that the claimed deductions are permissible under the “all events” test.
I.
Giant Eagle operates a chain of retail supermarkets, pharmacies, gas stations, and convenience stores in the Northeastern and Midwestern United States. Giant Eagle uses the accrual method of accounting to determine and report its income tax liability.[4]
A.
Giant Eagle’s fuel rewards program traces its origins to the supermarket chain’s introduction in 1991 of a customer-loyalty program called Advantage Cards. Initially, customers who presented an Advantage Card at checkout received discounts on promotion items and/or entire purchases. Then, in response to skyrocketing gasoline prices in the late 1990s and early 2000s, Giant Eagle opened gasoline stations on the premises of many of its supermarkets, where Advantage Cardholders received discounts on the purchase of gasoline, ranging from three to seven cents per gallon. However, Giant Eagle incurred significant losses on its first few years of gasoline sales, and the fuel discounts failed to increase supermarket traffic.
In April 2004, Giant Eagle revised the Advantage Card program. The new program, called “fuelperks!”, linked customers’ rewards at the pump to prior grocery purchases, ie., for every $50 spent on qualifying groceries, an Advantage Cardholder earned a ten cents-per-gallon discount on gas. A brochure distributed to customers set out the program’s ground rules, including that “discounts expire on the last day of the month, 3 months after they are earned,” and that “[t]he promotion is valid for a limited time only and may end at any time without prior notice.” Giant Eagle did not in fact end the promotion or revoke any accumulated discounts in 2006 or 2007, the tax years at issue. Moreover, fuelperks! led to a dramatic increase in Giant Eagle’s supermarket sales.
*669 B.
On its 2006 and 2007 corporate income tax returns, Giant Eagle claimed a deduction for the discounts its customers had accumulated but, at year’s end, had not yet applied to fuel purchases. Giant Eagle computed the deduction by (1) ascertaining the total dollar amount spent at its supermarkets on discount-qualifying items, (2) dividing that figure by 50 to determine the number of outstanding accumulated discounts, and (3) multiplying the quotient by $.10 to determine the face value of the discounts. Next, Giant Eagle (4) multiplied the discounts’ face value by the historical redemption rate of discounts in their expiring month, and (5) multiplied that product by the average number of gallons purchased in a discounted fuel sale.
From the outset of the fuelperks! program, Giant Eagle tracked customers’ redemption of accumulated discounts and used the historical averages to determine the amount of the claimed deductions. Thus, it did not base its computations of (4) and (5) on the number of discounts actually redeemed or the number of gallons of gasoline actually sold in the three months after year’s end. The Commissioner of Internal Revenue disallowed the deductions for the 2006 and 2007 tax years, which totaled $3,358,226 and $313,490, respectively.
C.
Giant Eagle petitioned the U.S. Tax Court for redetermination of its 2006 and 2007 income tax liabilities on two grounds. First, it argued that the discounts accumulated but not applied by year’s end satisfied the “all events” test because Giant Eagle’s liability became fixed upon issuance of the discounts. Alternatively, Giant Eagle urged that the accrued discounts be treated as sales-accompanying “trading stamps or premium coupons,” enabling it to offset the estimated costs against gross receipts from grocery sales.[5]
The Tax Court rejected both arguments. It found that Giant Eagle’s claimed deductions did not satisfy the “all events” test because the purchase of gasoline functioned as a condition precedent to customers’ redemption of discounts earned at checkout. Accordingly, the court reasoned, any fuelperks!-related liability became fixed only after customers applied the accumulated discounts to a fuel purchase, which, in the case of the disallowed deductions, occurred after the end of the tax year. Additionally; the Tax Court held that the Treasury Regulation governing “trading stamps” did not apply to the discounts that Giant Eagle customers accrued through fuelperks! because the gasoline discounts were not redeemable in “merchandise, cash, or other property,” as required under a 1978 revenue ruling.[6] For these reasons, the Tax Court sustained the Commissioner’s deficiency determinations for both tax years.
Giant Eagle appealed.
II.[7]
The “all events” test derives from dictum in a 1926 Supreme Court decision, explaining that a liability may accrue even “in advance of the assessment of a tax” if *670 “all the events [] occur which fix the amount of the tax and determine the liability of the taxpayer to pay it.”[8] The test has since been refined, prescribed as a Treasury Regulation, and eventually codified. Today, 26 U.S.C. § 461 and its implementing regulations limit accrual method taxpayers’ deductibility of liabilities as follows:
Under an accrual method of accounting, a liability ... is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability.[9]
The Treasury Secretary prescribed a supplementary regulation defining “economic performance” in the context of rebates and refunds:
If the liability of a taxpayer is to pay a rebate, refund, or similar payment to another person (whether paid in property, money, or as a reduction in the price of goods or services to be provided in the future by the taxpayer), economic performance occurs as payment is made to the person to which the liability is owed.[10]
Nonetheless, “certain recurring items” are subject to a more relaxed version of the “all events” test:
Notwithstanding [the general rule that “the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs”][11] an item shall be treated as incurred during any taxable year if—
(i) the all events test with respect to such item is met during such taxable year (determined without regard to [26 U.S.C. § 461(h)(1) ]),
(ii) economic performance with respect to such item occurs within the shorter of—
(I) a reasonable period after the close of such taxable year,[12] or
(II) months after the close of such taxable year,
(iii) such item is recurring in nature and the taxpayer consistently treats items of such kind as incurred in the taxable year in which the requirements of clause (i) are met, and
(iv) either—
(I) such item is not a material item, or
(II) the accrual of such item in the taxable year in which the requirements of clause (i) are met results in a more proper match against income than accruing such item in the taxable year in which economic performance occurs.[13]
For purposes of the “recurring item” exception, “the all events test is met with respect to any item if all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy.”[14]
The Commissioner does not contest that fuelperks! rewards qualify as both “a rebate, refund, or similar payment” and a “recurring expense” subject to the less *671 onerous “economic performance” requirement. Moreover, the Commissioner concedes that Giant Eagle calculated its anticipated fuelperksl-related liability “with reasonable accuracy,” and that economic performance had occurred by the time of Giant Eagle’s tax filing. Thus, the only issue on appeal is whether “the fact of liability” was fixed at year’s end[15] — that is, before the end of the tax year, had Giant Eagle become liable to pay the fuelperks! 10-cent discount to its customers who had purchased qualifying groceries with their Advantage Cards.
A.
Two seminal Supreme Court decisions frame our discussion of the “all events” test’s fixed liability requirement. In its first decision applying the “all events” test after its codification, the Court held, in United States v. Hughes Properties, Inc., that a casino operator was entitled to deduct the annual increase in its progressive jackpot payoff amounts, including for jackpots not won by year’s end.[16] While the Court acknowledged that there remained an “extremely remote and speculative possibility [ ] that the jackpot might never be won,” it nonetheless concluded that the anticipated liability was “fixed” under Nevada law, which “forbade reducing the indicated payoff without paying the jackpot.” [17]
One year later, in United States v. General Dynamics Corp., the Court disallowed deductions claimed by a commercial taxpayer on the basis of its obligation to reimburse employees for medical expenses incurred by year’s end, but not yet submitted for reimbursement on an official claim form.[18] The. Court reasoned that because the taxpayer was “liable to pay for covered medical services only if properly documented claims forms were filed,” “[t]he filing of the claim [was] thus a true condition precedent to liability on the part of the taxpayer.” [19] Though decided one year earlier, Hughes Properties expressly survives General Dynamics. Whereas the casino operator in Hughes Properties “could not escape” its “fixed liability for the jackpot ... as a matter of state law,”[20] the General Dynamics Court emphasized that employees’ “[m]ere receipt of services ... does not, in our judgment, constitute the last link in the chain of events creating [employer] liability.”[21]
Two of our sister circuit courts of appeals have helpfully construed these ostensibly discordant decisions. Most recently, in Massachusetts Mutual Life Insurance Co. v. United States, the Federal Circuit Court of Appeals held that a life insurance company was entitled to claim deductions on the basis of future policyholder divi *672 dends, guaranteed by the company’s board of directors.[22] The court explained that under Hughes Properties, the dividends constituted a fixed liability as of the board’s adoption of resolutions guaranteeing their payment, despite ensuing uncertainty as to which policyholders were entitled to the payments and the amount each policyholder would receive.[23] In the court’s view, General Dynamics did not disturb Hughes Properties’ holding that a liability may be fixed in fact without being fixed as to the amount or date of payment; instead, the later decision merely precluded characterization of anticipated liabilities as “fixed” if “subject to some event that must occur for a liability to become due.”[24] Because boardroom resolutions conclusively established the fact of the life insurance provider’s liability for future dividends, the court held that the anticipated liabilities were not subject to a condition precedent and therefore qualified as deductible expenses under the “all events” test.[25]
The Ninth Circuit Court of Appeals also ruled on the issue of the “all events” test in Gold Coast Hotel & Casino v. United States.[26] Relying on Hughes Properties ’ acknowledgment of an “extremely remote and speculative possibility” that the deductible anticipated liability would never be paid, the court announced that, “for purposes of the ‘all events’ test, what is critical is the existence of an absolute liability, not an absolute certainty the liability will be discharged by payment.”[27] Thus, the court allowed a casino to deduct the value of its gamblers’ accumulated but as-yet-unredeemed “slot club” rewards points, despite the high likelihood that some of the points accounted for as deductions would never be redeemed.[28] Unlike the filing of a claim form, gamblers’ demand for payment was considered a mere technicality which did not involve third parties or require “proof of their right to payment,” and therefore did not constitute “a condition precedent to fixing Gold Coast’s liability for the value of accumulated slot club points.”[29]
Our sister courts’ approaches are consistent with our only reported decision on the subject. In Lukens Steel Co. v. Commissioner, a case that predated codification of the “all events” test, we held that an accrual method taxpayer was entitled to deduct payments credited to a “contingent liability account,” even though they “would not be paid out immediately or at a specified time.”[30] Critically, however, under the *673 terms of a collective bargaining agreement, “[i]t was not possible for Lukens to cancel the contingent liability account without paying” the credited amounts.[31] Because the taxpayer irrevocably committed to the payments during the tax year at issue, it was entitled to deduct corresponding future liabilities that “would be paid in a reasonable period of time.”[32]
B.
As in Lukens Steel, here we determine whether the taxpayer’s anticipated liability was fixed at year’s end with reference to contract law principles.[33] Specifically, Giant Eagle characterizes its issuance of fuelperks! rewards as a unilateral contract formed at checkout, which conferred instant liability on the supermarket chain to its customers for the rewards they accrued.
Unlike bilateral contracts, which are premised on reciprocal promises, “unilateral contracts ... involve only one promise and are formed when one party makes a promise in exchange for the other party’s act or performance. Significantly, a unilateral contract is not formed and is, thus, unenforceable until such time as the offeree completes performance.”[34] A unilateral contract also differs from an unenforceable contingent gift in that a reasonable person would understand that she could accept the offer and reap the promised reward simply by performing the task specified.[35] Thus, a Pennsylvania court held that a car dealership, advertising a discount on a future car purchase if a hole-in-one was made on the ninth hole of a local golf course, was obligated to honor its “offer” when a golfer finally aced the hole — despite the dealership’s stated intention to end the promotion two days earlier.[36] The court reasoned, “[i]t is the manifested intent of the offeror and not his subjective intent which determines the persons having the power to accept the offer.”[37] Because “the offeror’s manifested intent, as it appeared from signs posted at the ninth tee, was that a hole-in-one would win the car,” the dealer was liable in accordance with such reasonable expectations.[38]
*674 So too might a Giant Eagle customer have reasonably presumed the redeemability of accumulated fuelperks! rewards, as provided by the well-publicized “Simple Program Guide”:
[[Image here]]
The brochure distributed to Advantage Cardholders also included fine print providing, inter alia, that “discounted fuel cannot exceed 30 gallons and discounts must be used in full on one vehicle in one transaction”; “[t]he promotion is valid for a limited time and may end at any time without prior notice”; and “fuelperks! discounts expire 3 months after the last day of the month in which they’re earned.” But none of the published program parameters suggested that Giant Eagle reserved the right to retract rewards that customers had already accrued. Indeed, in the entire history of Giant Eagle’s fuel rewards program, “[n]o such retroactive termination ever occurred, or was even contemplated.” [39]
Like the golfer who teed off with a promise of reward in mind, a customer anticipated the promised fuel discounts when deciding to shop at Giant Eagle in the first place — and thus deciding not to shop at a different store. Because she was then aware that she could apply the discounts as advertised if she spent fifty dollars on supermarket purchases using her *675 Advantage Card, she was indeed a party to a unilateral contract with Giant Eagle. Liability therefore attached upon her performance, i.e., at checkout.
For purposes of the “all events” test’s fixed liability prong, it is irrelevant that neither the total amount of Giant Eagle’s anticipated liability nor the identity of all the customers who eventually applied discounts toward gasoline purchases could be conclusively identified at year’s end.[40] And while there remained an “extremely remote and speculative possibility” that the amount of Giant Eagle’s claimed deductions would overstate the value of the rewards its customers ultimately redeemed,[41] Giant Eagle significantly mitigated that risk by tracking its customers’ monthly redemption rates and offsetting the deductions accordingly to account for prospective non-redeemers. Giant Eagle amply demonstrated the existence — as of year’s end — of both an absolute liability and a near-certainty that the liability would soon be discharged by payment. The chance of non-redemption had been calculated by Giant Eagle “with reasonable accuracy” as conceded by the Commissioner. The “all events” test demands no more. We hold, therefore, that following Hughes Props, and Lukens Steel, Giant Eagle was entitled to deduct fuelperks!-related liabilities incurred during the tax years at issue.
III.
By disallowing deductions claimed on the basis of established recurring expenses, the Tax Court effectively obliterated the distinction between two accounting methods expressly authorized by the Tax Code.[42] The extent to which cash and accrual methods of accounting sometimes yield different deductions is a byproduct of the Tax Code’s design. So long as a taxpayer consistently adheres to one accounting method, the Code is agnostic as to the benefit or hardship wrought by his selection.[43]
For the foregoing reasons, we will reverse the Tax Court’s order sustaining the Commissioner’s deficiency determinations and remand this case with instructions to grant judgment in favor of Giant Eagle on the ground that the claimed deductions are permissible under the “all events” test.[44]

. Letter from Benjamin Franklin to Jean Baptiste Le Roy (Nov. 13, 1789), in 10 The Writings of Benjamin Franklin 69 (Albert Henry Smith ed.1907).

. 26 U.S.C. § 461(h)(4).

. Id. § 461(h)(3)(A).

. Giant Eagle, Inc., a Pennsylvania corporation, filed a consolidated income tax return accounting for its subsidiaries' revenue and liabilities during each tax year at issue.

. See Treas. Reg. § 1.451 — 4(a)(1).

. See Rev. Rui. 78-212, 1978-1 C.B. 139.

. The Tax Court had jurisdiction over Giant Eagle’s petition pursuant to 26 U.S.C. §§ 6213(a), 6214(a), and 7442. We exercise exclusive appellate jurisdiction under 26 U.S.C. § 7482(a)(1). We review de novo whether a taxpayer has satisfied the "all events” test, see In re Harvard Indus., 568 F.3d 444, 450 (3d Cir.2009), but we review the Tax Court’s factual findings for clear error, see Historic Boardwalk Hall, LLC v. Comm’r, 694 F.3d 425, 447 n. 48 (3d Cir.2012).

. United. States v. Anderson, 269 U.S. 422, 441, 46 S.Ct. 131, 70 L.Ed. 347 (1926).

. Treas. Reg. § 1.461-1 (a)(2)(i).

. Id. § 1.461-4(g)(3).

. 26 U.S.C. § 461(h)(1).

. A Treasury Regulation defines a "reasonable period” as "[t]he date the taxpayer files a timely (including extensions) return for that taxable year.” Treas. Reg. § 1.461-5(b)(l)(ii)(A).

. 26 U.S.C. § 461(h)(3)(A).

. Id. § 461(h)(4).

. Notably, the “matching requirement” contained in 26 U.S.C. § 461(h)(3)(A)(iv)(II) is "deemed satisfied ... [i]n the case of a liability described in [Treasury Regulation § 1.461-41(g)(3) (rebates and refunds).” Treas. Reg. § 1.461 — 5(b)(5)(ii).

. 476 U.S. 593, 601-02, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986).

. Id. at 601, 106 S.Ct. 2092.

. 481 U.S. 239, 243-45, 107 S.Ct. 1732, 95 L.Ed.2d 226 (1987).

. Id. at 243-44 & n. 5, 107 S.Ct. 1732 ("[A] taxpayer may not deduct a liability that is contingent or contested. Nor may a taxpayer deduct an estimate of an anticipated expense, no matter how statistically certain, if it is based on events that have not occurred by the close of the taxable year.” (internal citations omitted)).

. 476 U.S. at 601-02, 106 S.Ct. 2092.

. Gen. Dynamics, 481 U.S. at 244-45, 107 S.Ct. 1732; but see id. at 249, 107 S.Ct. 1732 (O’Connor, J., dissenting) (“In my view, the circumstances of this case differ little from those in Hughes Properties.")

. 782 F.3d 1354, 1364-65 (Fed.Cir.2015).

. See id. at 1365 (“[N]ot knowing the ultimate recipient of the payment does not prevent a liability from becoming fixed.” (citing, inter alia, Hughes Props., 476 U.S. at 601, 106 S.Ct. 2092)).

. Id. (citing Gen. Dynamics, 481 U.S. at 244, 107 S.Ct. 1732).

. See id. at 1365, 1371. The Federal Circuit distinguished a recent Second Circuit decision, N.Y. Life Ins. Co. v. United States, 724 F.3d 256 (2d Cir.2013), disallowing policyholder dividend deductions on the ground that in that case payment of the dividends was subject to various conditions precedent. See Mass. Mut., 782 F.3d at 1364. Unlike the ironclad payment guarantees resolved by the life insurance provider’s board of directors in Massachusetts Mutual, id. at 1365, the annual dividends credited to policyholders’ accounts in New York Life would not be paid out until the policies’ anniversaiy date, and only then if policyholders remained current on all premium payments, 724 F.3d at 258-59, 263-64.

. 158 F.3d 484 (9th Cir. 1998).

. Id. at 489.

. See id. at 490-91 (”[T]he data in the record suggests that only 69% of slot club points are actually redeemed.”).

. See id. at 490 (distinguishing Gen. Dynamics, 481 U.S. at 244, 107 S.Ct. 1732).

. 442 F.2d 1131, 1134-35 (3d Cir.1971) ("In similar situations it has been held that indet- *673 erminancy as to the time or amount of payment does not destroy the deductibility of an accrued item when the amount of liability is absolutely fixed.” (citations omitted)).

. Mat 1134.

. Id. at 1135; accord Wash. Post Co. v. United States, 186 Ct.Cl. 528, 405 F.2d 1279, 1284 (1969) ("[W]hen a group liability is involved, it is the certainty of the liability which is of the utmost importance in the all events test, and not necessarily either the certainty of the time over which payment will be made or the identity of the payees.” (internal quotation marks omitted)).

. Accord Rev. Rul. 98-39, 1998-2 C.B. 198 ("Where a taxpayer’s obligations are set forth in a written agreement, the terms of the agreement are relevant in determining the events that fix the taxpayer’s obligation to pay.”). To be sure, noncontractual obligations such as those contained in a statute or regulation may serve an analogous function, see Hughes Props., 476 U.S. at 596, 106 S.Ct. 2092 (Nevada Gaming Commission regulation); Gold Coast Hotel, 158 F.3d at 488 & n. 6 (same), but the "all events” test does not require that liabilities be fixed by such external sources.

. First Home Sav. Bank, FSB v. Nernberg, 436 Pa.Super. 377, 648 A.2d 9, 14 (1994) (internal citations omitted).

. See Cobaugh v. Klick-Lewis, Inc., 385 Pa.Super. 587, 561 A.2d 1248, 1249-50 (1989); see also Pacitti v. Macy’s, 193 F.3d 766, 774-75 (3d Cir.1999).

. Cobaugh, 561 A.2d at 1250.

. Id. at 1251 (citing Restatement (Second) of Contracts# 29 (1981)).

. Id.-

. See Hughes Props., 476 U.S. at 604-05, 106 S.Ct. 2092 (“None of the components that make up this parade of horribles, of course, took place here.”). Nor could Giant Eagle have terminated the rewards retroactively “without an explicit reservation of the power to do so.” Abbott v. Schnader, Harrison, Segal & Lewis, LLP, 805 A.2d 547, 558-60 (Pa.Super.Ct.2002); see Kemmerer v. ICI Americas Inc., 70 F.3d 281, 287 (3d Cir.1995).

. See Lukens Steel, 442 F.2d at 1134-35 ("[I]ndeterminancy as to the ... amount of payment does not destroy the deductibility of an accrued item when the amount of liability is absolutely fixed.”); Mass. Mut., 782 F.3d at 1365 ("[N]ot knowing the ultimate recipient of the payment does not prevent a liability from becoming fixed.” (citing, inter alia, Hughes Props., 476 U.S. at 601, 106 S.Ct. 2092)).

. See Hughes Props., 476 U.S. at 601, 106 S.Ct. 2092.

. See 26 U.S.C. § 446(c)(2). The accrual method of accounting differs fundamentally from its cash counterpart. Whereas businesses that choose the latter method refrain from counting revenues until they are received and expenses until they are paid, those using the accrual method account for transactions when they occur, regardless of when the money, goods, or services actually change hands.

. See 26 U.S.C. § 446(a), (b) (providing that the Treasury Department may only recalculate a taxpayer's liabilities without respect to the accounting method regularly used in keeping his books if "no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income”).

. Because we are reversing on the basis of the Tax Court’s misapplication of the "all events” test, we express no opinion concerning the soundness of its alternative holding that the Treasury Regulation governing "trading stamps” is inapplicable to fuelperks! rewards accompanying Giant Eagle supermarket purchases. Nor do we discuss whether the Tax Court accorded Revenue Ruling 78-212 supererogatory deference. Cf. In re WorldCom, Inc., 723 F.3d 346, 357 (2d Cir.2013); Kornman & Assocs., Inc. v. United States, 527 F.3d 443, 454 & n. 9 (5th Cir.2008); Aeroquip-Vickers, Inc. v. Comm’r, 347 *676 F.3d 173, 181 (6th Cir.2003); Omohundro v. United States, 300 F.3d 1065, 1067-68 (9th Cir.2002); Del Commercial Props., Inc. v. Comm’r, 251 F.3d 210, 214 (D.C.Cir.2001).